### DELAHUNTY v. HAKE et al.

(Supreme Court, Appellate Division, First Department. August 4, 1897.)

TROVER—DEMAND—EVIDENCE.

A certificate of stock was deposited with the trustees of the corporation under an agreement with an employé that if he would remain in the service of the corporation till December 31, 1895, the trustees would deliver the certificate to him. Prior to that date, a demand for the certificate was made by a receiver of the employé, who was told by the trustees that the matter was in the hands of their attorneys; and in January, 1896, in response to a letter from said attorneys to the receiver's attorneys, an employé of the latter called on a representative of the trustees' attorneys, and, upon asking whether the latter would not advise their clients to deliver the stock, was told that they could not safely do so. Held, that it was for the jury to say whether there was a demand on an authorized representative of the trustees in January, 1896, and a refusal to deliver.

O'Brien, J., dissenting.

Appeal from trial term, New York county.

Action by John Delahunty, as receiver of the property of George W. Proctor Knott, against Philip Hake and others, as trustees of the Philip Hake Manufacturing Company. From a judgment for plaintiff, defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and RUMSEY, PATTERSON, O'BRIEN, and PARKER, JJ.

George C. Lay, for appellants.
William P. Burr, for respondent.

PARKER, J. This action was brought to recover from the defendants possession of a certificate for 30 shares of stock of the Philip Hake Manufacturing Company, or, if possession could not be had, for the value thereof. The result of the trial was a judgment in favor of the plaintiff, the jury fixing the value of the stock at the sum of $2,250. When this action was before this court on a former appeal (10 App. Div. 230, 41 N. Y. Supp. 896), the judgment was reversed, on the ground that there was no proof of a demand, except during the time when the defendants' possession was rightful, and hence their refusal to surrender possession did not constitute a conversion. On the retrial, plaintiff attempted to supply the defect of the former trial by evidence which, it is claimed, establishes (1) that a proper demand was made by the plaintiff after December 31, 1895, and before the commencement of the action; and (2) that the defendants had refused to deliver the property, and therefore a demand would have been unavailing and unnecessary. Whether any error was committed by the court upon this branch of the case is the only question which will be considered on this review, and therefore only such facts as are pertinent to such a consideration need be referred to.

George W. Proctor Knott, of whose property the plaintiff is receiver, entered into an agreement with one Philip Hake in January, 1891, that Hake should deliver to the trustees of the Philip Hake Manufacturing Company, in escrow, a certificate for 30 shares of stock, which is now the subject of controversy, to be indorsed in blank by Knott, and held by said trustees under the terms and conditions of such agreement. One of the conditions was that Knott should remain in the employment of the company until December 31, 1895, or until his death, if he should die before that time. It provided "that on December 31, 1895, if the party of the second part shall then remain in the employ of said corporation, the said trustees shall be, and hereby are, authorized to deliver said certificate of stock to the party of the second part." At the time of the commencement of this action, and prior thereto, these defendants were the trustees of that corporation. October 21, 1895, the plaintiff was, by order of the supreme court, appointed receiver of all the personal property of said Knott in sequestration proceedings for the nonpayment of alimony, under section 1772 of the Code of Civil Procedure. Subsequent thereto, and on October 31st, the receiver made a demand upon the defendants for the certificate of stock, which had been delivered to the defendant trustees in escrow, in pursuance of the agreement to which reference has been made. It will be observed that the receiver was not at that time entitled to the possession, for, under the agreement, the defendants, as trustees, were not only entitled to, but were in duty bound to retain, possession of the certificate until the 31st day of December following. Not until then could it be known whether Knott would become entitled to it, for one of the conditions of the transfer of the stock was that he should continue in the employment of the company until the 31st day of December, 1895.

It is not claimed that the receiver or his representatives made a demand upon the defendants, or any of them, personally, after the 31st day of December, 1895. But it is insisted, nevertheless, that a legal demand was made upon the defendants through their attorneys, to whom, the plaintiff insists, authority was given to represent the defendants in this matter, of which fact the plaintiff was advised by one of the defendants. The foundation for this claim, briefly stated, is that, immediately after the appointment of a receiver, plaintiff's attorneys saw the defendants, and exhibited the order appointing plaintiff receiver, and asked for the stock, and were then told that the matter was in the hands of Hatch & Wickes, their attorneys. A few days later, the attorneys for the plaintiff wrote the defendants about the matter; and on November 13th Philip Hake, in a letter to plaintiff's attorneys, stated: "Your favor received. Our attorneys are Messrs. Hatch & Wickes, 35 Liberty. I sent your letter to them, and you will please confer with them, and oblige." Correspondence thereafter ensued between Messrs. Hatch & Wickes and the plaintiff's attorneys, in the course of which plaintiff's attorneys presented their understanding of the facts, and expressed the opinion that the receiver was entitled to the stock. The last letter of the series was dated January 10, 1896, and was written by Messrs. Hatch & Wickes, who therein explained the cause of delay in writing, and concluded: "If

your Mr. Wilson, or any representative of your office, will call, Mr. Kenyon will confer with him about the same." Mr. Kenyon was an attorney connected with the firm of Hatch & Wickes. Four days later, Mr. Wilson called at the office of Hatch & Wickes, and had an interview with Mr. Kenyon. That interview was not before the court on the former appeal, as appears from the following extract from the opinion:

"There was evidence on the part of one Wilson, who was in the employ of the plaintiff's attorneys as a managing clerk, and who swore that he called at the office of the defendants' attorneys in January with regard to the payment or delivery by the trustees of the company to the plaintiff of the stock in question; but what transpired at this interview does not appear."

On this trial, Mr. Wilson testified that, in the interview between himself and Mr. Kenyon, on January 14th—.

"I asked Mr. Kenyon whether now Hatch & Wickes would advise the Hake Company to deliver this stock to Mr. Delahunty, as receiver. He said, as I recollect, that there were assignments that had been filed with the Hake Company regarding this stock, and that, in the face of notice of those assignments, the Hake Company could not safely deliver the stock to Mr. Delahunty. I then suggested that the only way out of that predicament was for Mr. Delahunty to bring an action wherein the trustees might interplead these various claimants, and Mr. Kenyon, as I recollect, said that he thought that would be the course to pursue."

In regard to the same interview, Mr. Kenyon testified:

"Q. Mr. Wilson testified, if my recollection serves me right, that he asked if Hatch & Wickes were prepared to give up the stock. A. There was not a word of that kind said by Mr. Wilson to me,—not one word. The conversation was that we could not advise the Hake Company to surrender the stock to the receiver, for the reason that Mr. George W. Proctor Knott had not fulfilled his contract, and that the contract was assigned to his father, and the salary had been assigned to a man, to a man by the name of Strange, in Boston. I did not have at that time in my possession the stock. I was not authorized to deliver it. I did not have any control over it. I did not know where it was. Q. Did Mr. Wilson at any time make a demand for the stock? A. No, sir. Q. Did he ask for the stock? A. No, sir. Q. Did he ever request you to deliver it? A. No; all the conversation that was had between Mr. Wilson and myself related to what had occurred between Mr. Burr and Mr. Hake. Q. In regard to the first demand, about the 31st of October? A. Yes; all the conversation and all the correspondence related to that, and nothing else."

The respondent's contention that it should be held, as matter of law, that the conversation of January 14th, which we have quoted, constituted a legal demand for the stock, and a refusal, must be considered; for, while such was not the view of the trial court, no harm resulted to the defendants if the court, instead of charging that a demand was made, erroneously charged, as appellants urge, that there was a refusal, and that, therefore, a demand was not necessary. Whether there was a demand for the stock on the 14th of January seems to have presented a question of fact for the jury, rather than one of law for the court. In the first place, it should be borne in mind that a demand was made by the plaintiff on the 31st day of October. True, that demand cannot avail him in this suit, but it was immediately following that demand that the defendants referred the matter to their attorneys, and so advised the plaintiff's attorneys. They made no such reference after the 1st of January, when the plaintiff was in a position to have made an effective demand.

Was it their intention to refer to their attorneys the matter of determining what was their right and duty in the situation as it then existed, which embraced a demand for the stock prematurely made upon them personally, or to authorize their attorneys to represent them in such future steps as the plaintiff should find it necessary to take in order to create what then did not exist, viz. a cause of action against them, in favor of the receiver? Again, how did the plaintiff understand it? Was he relying upon the demand already made? Did he or his attorneys understand that a further demand was necessary in order to charge the defendants with conversion, and, if so, that such demand could be made upon the attorneys, rather than on the defendants?

Without further reference to the suggestions which the situation prompts, it would seem that a question was presented for the jury whether, under the evidence, it was the understanding of both parties that Hatch & Wickes, the attorneys, should represent the defendants for the purposes of the making of a demand upon them, should one be found necessary, in order to charge them with liability. Assuming such question of fact to be found in favor of the plaintiff, the next question would be whether a demand was made on Kenyon. It is true, as the respondent insists, that there is no stereotyped manner of demand recognized by the law, and that any demand which indicates clearly what is demanded, who are the parties, and the authority of the person making the demand, will be sufficient. The plaintiff says that when Mr. Wilson, representing the plaintiff, asked Mr. Kenyon whether now Hatch & Wickes would advise the Hake Company to deliver the stock to Mr. Delahunty, as receiver, he made a demand for the stock. Is it certain that his purpose in making that remark was to make a demand? It may well be that the parties to that conversation supposed that they were conducting amicable negotiations, looking to the possible adjustment of the differences without litigation, and based in part upon the premature demand of October 31st. It cannot be held as matter of law, therefore, that a demand was then made. Indeed, the most favorable holding possible for the plaintiff is that the jury were at liberty to find that Mr. Wilson intended to make a demand; that Mr. Kenyon was the defendants' authorized representative, and so understood it; and that what he said was intended for a refusal. The charge of the court upon the subject, and the whole of it, is as follows:

"He must make a demand after January, 1896. I say to you there is no dispute upon that point, that the plaintiff's lawyer and defendants' lawyer both agreed that the conversation was, 'We will give no certificate,' and no demand is needed where there is a refusal in advance."

To this portion of the charge defendants' counsel excepted. It will be observed that the learned court submitted no question whatever to the jury upon the question of demand or refusal. The effect of his charge was a direction that, so far as that branch of plaintiff's case was concerned, it was made out. Undoubtedly, a situation may be presented where a refusal of a party to surrender possession of property may do away with the necessity of a demand. The instances of it are rare, for the party in possession of personal prop-

erty seldom seeks out the real or pretended owner to refuse him possession of property. He usually waits until called upon to surrender possession before refusing to do it. And where, as in this case, the possession of the party is rightful, and he has not attempted to dispose of it or exercise acts of dominion over it, it is necessary to show some act amounting to a conversion, and evidence of a demand is usually a necessary part of such proof. Where a refusal to make delivery is accepted as an equivalent of both a demand and refusal, it must appear that the necessity for a demand was dispensed with. Such a case was Rider v. Pond, 19 N. Y. 262. The answer averred that the defendant himself gave notice to the plaintiff that he was ready to perform, and, pursuant to such notice, the parties met at the defendant's office in the city of New York, and there the defendant refused to deliver the security which he ought to have delivered, except upon conditions named, which he had no right to impose; and it was held that a demand was thereafter unnecessary. But in this case there was not a meeting of the parties. It was a meeting of the clerks of the attorneys for the parties, for the purpose of ascertaining what were the rights of the clients of their respective employers, and what advice ought to be given them in the premises. At the most, there was presented a question of fact whether the parties to this conference and their employers understood that the attorneys had the right to represent the defendants as to a demand. But as we have already sufficiently discussed that subject, further reference to it will not be made.

Again, it was for the jury to say whether both parties to that conference supposed they were acting under a situation created in part by the demand of October 31st, and were merely considering what advice should be given to their respective clients in view of it, or whether the parties were intending to provide for a new situation, which in part came into existence after the 31st day of December, and therefore intended to refuse delivery in behalf of the defendants. These questions were for the jury, not for the court, to pass upon. But they were taken away from the jury, and the exception taken thereto entitles the defendants to a reversal of the judgment.

The judgment should be reversed, and a new trial ordered, with costs to the appellants to abide the event.

PATTERSON and RUMSEY, JJ., concur. VAN BRUNT, P. J., concurs in result.

O'BRIEN, J. (dissenting). I think the evidence, taken as a whole, upon the question of demand, is fairly susceptible of but one inference, viz. that the defendants' course would be controlled entirely by the advice of their counsel, to whom plaintiff was referred. Thereafter a demand on the defendants would have been a useless and senseless formality, because they had said, in substance, that they would be guided entirely by their counsel. The plaintiff, therefore, very properly, as directed and requested personally and by letter, sought out the defendants' attorneys after December 31, 1895. The

exact language used between the representatives of the respective counsel is of no moment, because both agree that on that occasion the plaintiff's representative was told, in effect, that the defendants would not deliver the stock, because Knott had failed to perform, because he had assigned the certificate, etc. I think the trial judge was right in holding, as matter of law, that a demand on the defendants personally after December 31st was unnecessary, because their attorneys represented them, and were authorized to state to the plaintiff the stand which the defendants would take. This, as communicated to the plaintiff, was that the stock would not be delivered, for the reasons given at the interview. It is clear, moreover, that the defendants would not, contrary to counsel's advice, have responded to any demand. Under these circumstances, to hold that such a demand was necessary would be to take advantage of a technical point or ground, and reverse a proper judgment in plaintiff's favor, in a case that has already been twice tried. I therefore dissent.